In our next case is number 23-11376. Samantha Banks and Amy Sinusi v. Grady Memorial Corporation. Mr. Scott. Good morning, your honors. May it please the court. My name is Justin Scott and I represent Amy Sinusi and Samantha Banks, former nurses at Grady in his mother-baby unit. This case concerns discrimination on the basis of national origin and retaliation for opposing such discrimination. As this court recently recognized in the times decision, all that is required for a plaintiff to proceed to a jury is quote, simply enough evidence for a reasonable fact finder to infer intentional discrimination in an employment action. That standard is clearly met and exceeded here. The key decision maker, Tabitha Johnson, the unit's director said, among many other things, the following, there are too many Africans on the unit and some of them need to be gotten rid of. I'm not going to hire any more Africans. I'm going to reject resumes with African sounding names. We have too much of the same. She made a pie chart for the purpose of showing the percentage of Africans on the unit so that in her words, they can be diluted out and the percentage of the demographics on the unit normalized in her words, the district. Are you in a way asking us to sort of ditches the wrong word, but to bypass and ignore the McDonald Douglas standard for like a mosaic standard of the evidence, because you do address the concept of pretext in your brief and explain why you think even under the traditional McDonald Douglas burden shifting standard, you get to a jury on the issue of pretext. We are asking your honor for the simple application of rule 56. And that can be either through the convincing mosaic metaphor, which we've argued and in the case of Ms. Banks through McDonald Douglas. But that's obviously, as your honor knows, a mechanistic tool to get to the same result, which is, is there enough evidence in the record to establish retaliatory or discriminatory intent? And, and tines and McRae, the recent decision in September from this court make clear that's the ultimate inquiry. And so we did argue convincing mosaic and McDonald McDonald Douglas for Ms. Banks at the district court level. We only argue convincing mosaic for Ms. Anusi at the district court level. But the district court was without this court's guidance and tines and progeny at the time that the original order was entered, the district court found your honor, that no reasonable jury could conclude that the person who made these statements and that chart was motivated by discriminatory animus when she terminated an African nurse, Ms. Anusi. Let me ask you a question about the facts. Is Ms. Anusi, does she, does she contend that the clinical incidents for which she was disciplined didn't happen? Yes, your honor. And is there evidence of that in the record? Yes, your honor. What, what's the evidence? Just describe it for me. There's two incidents which allegedly precipitated the termination. There's the September 17th, 2020 alleged failure to take blood pressures. Ms. Anusi was not the nurse assigned to those patients. But was she the nurse supervising the person who was supposed to do that? She was the preceptor. Yes, your honor, but she was not the nurse assigned. And at Grady, actually the tech is supposed to take the blood pressures. Initially, the nurse is then supposed to make sure that the tech took the blood pressures and then Ms. Anusi is one up removed from that as the preceptor. But those were not her patients. What about the contention that she lied about having the blood pressure having been taken? As to the September 17th, 2020 incident, there is no evidence in the record to support that. Grady cites to its own statement of material fact in support of that contention, which I believe is 63, which in turn relies on the testimony of Nafia Bennett. If you look, your honor, and we pointed this out in our brief, and Ms. Bennett's testimony, there is nothing to support that. What there is support for is the blood pressures were not taken. The RL solutions report submitted by the doctor says that the blood pressures were not taken, but there's nothing in the record to suggest that she lied about taking them. As to the October incident, there's the claim that she took the blood pressure, but didn't report it timely. And then when- And that's why we have the clock discrepancy. Exactly, your honor. But aren't they now saying she didn't report it immediately to the doctor, whether it was 10 minutes or four hours? Right. So the clock incorrectly displayed when the doctor came into the room that four hours plus had elapsed between the time that she took the blood pressure and the time that the doctor came into the room. Ms. Zanussi, in fact, had been away from no more than five minutes, had been intending to call the doctor when she was called upon by another patient across the room. The key, your honor, is Tabitha Johnson, the decision maker, the person who made all those statements, knew that. She knew that and she terminated Ms. Zanussi anyway. What's the evidence that she knew that? Her testimony. And she said what? She said, I looked at the clock. I'm paraphrasing. I looked at the clock and I determined, yes, it was off by four hours. There are text messages where she is going back and forth with another nurse, told Ms.  Yes. I looked at the clock, Ms. Zanussi showed me where it was wrong. This prevents the application of the honest, good faith belief doctrine because it's within the personal knowledge of the decision maker that the alleged reason for the termination is, is not proven. What about the second part that even after the discrepancy with the clock was discovered, she still didn't report the blood pressure to the doctor immediately? Well, the, the issue of the immediacy of the reporting is she did. In fact, now she was planning on calling the doctor. She came back into the room. She did in fact report it within five minutes. If you look at the actual protocols, Grady's protocols, there is no requirement for how soon the blood pressure must be reported in actuality. What they say is you take the blood pressure, you wait 20 minutes in some cases, depending on the medication. Or you wait 10 minutes that is in the record, your honor at 101 18. And so, and in terms of the explanation, she, the blood pressures were reported to the doctor within five minutes because the doctor arrived, but they would have been when she came back into the room. The problem was the doctor came back in, was irate because it looked like these blood pressures had been there for four hours plus and would not listen to the explanation. Okay. Let's suppose there are issues of fact on all of that. As you say, um, what is the evidence that, uh, the, the action that occurred against her was based on race? All of the statements that you said by Ms. Johnson, all of the statements that we, we previously indicated, including statements that are directly tied to employment decisions, I'm not going to hire any more Africans. There are too many Africans. They need to be gotten rid of. How was Ms. Johnson involved in her termination process? Ms. Johnson was a primary decision-maker. She acted in consultation with her supervisor, Ms. LaScoda and HR, although HR testified that if Ms. Johnson and Ms. LaScoda had decided not to terminate Ms. Sanusi, he would have been fine with that. Can I hijack your argument? Okay, go ahead. Did you finish? Go ahead. I'm finished.  Oh, okay. I want to go back to September because you said Bennett didn't say that. I think that's what I heard you say. Bennett didn't say that there's no evidence, your honor, that Ms. Sanusi lied. Bennett did say that she didn't take the blood pressure. Okay. I know. I'm I'll go through this as I understood it. Cause it's a little different than what you just said, but I may be wrong. So, uh, the doctor reported there were two patients that did not have the blood pressure taken for 12 hours. Is that correct? I believe that's correct, your honor. And they belong to a new nurse. It was your, uh, the new nurse who was in our, in Sanusi was the preceptor for that new nurse. Is that right? Correct. Okay. And, and she was responsible for the nurse and overseeing that nurse's work, correct? That was Bennett's testimony. Okay. And so I thought she's claimed it was not her responsibility to ensure that the nurses were taken vital signs and instead the nurse was to follow up with a technician. I thought she was trying to say it was not her responsibility to make sure the new nurse was taken vital signs.  But it was her responsibility. That's that's Grady's claim. Yes. But the distinction, your honor, that I'm drawing and my answer to the previous question is Ms. Sanusi never claimed that she did take the blood pressures, right? I'm going to go further, but so Grady says it was her responsibility to make sure the new nurses or this particular new nurse who was in orientation, she knew she was in orientation that day, right? She knew that. And she was, and she did not ensure she was taken. Um, forget about whether Grady's right or not, but she did not make sure she was taking the blood pressure. And in fact, it didn't happen for 12 hours. Right. The blood pressure on September 17th was not taken for 12 hours. I believe that's right. Okay. And this was supposed to be taken by a nurse that Sanusi was supervising. That's that is the argument from Grady's. No, those are the facts. I don't know whether, I mean, she was supervising her and the, and, and, and the blood pressure was not taken. And your client says, well, that was the tech's job, not mine. Well, our argument, your honor, is that it's initially the tech's job. And then it was the, the nurse to whom the patients were actually assigned. And then it was Sanusi who was over them. Ms. Sanusi was the preceptor. That's, that's, but she's over the new nurse who was supposed to take the blood pressure. That's what the argument is from Grady. Yes. We, any of it wasn't taken for 12 hours and everybody agrees about that. Yes. All right. So let's go to Bennett, who at this point was the director of the family person, and he did the investigation, right? No, if you bet it, she, yes, yes, your honor. Okay. And to the incident. And I think the line comes, it's not like he said, she died exactly. He says she completed a shift assessment showing the patient's physical condition for the two patients. Okay. So she completed the shift assessment, right? But no, how can you assess somebody? If no blood pressure has been taken for 12 hours, so his lying argument, I mean, I don't know what to call it. What did the shift assessment say? She was okay. That's not in the record. Your honor. Okay. But she completed a shift assessment. You agree with that? Yes. And the shift assessment's not in the record. Correct. Okay. And during that shift, there was no blood pressure taken, right? For 12 hours. For those, for those two patients assigned to the new nurse. Correct. And so that's what Bennett was upset about. She completed the shift assessment and she didn't acknowledge, you know, that, that, that there was no blood pressure during that time. That's correct, your honor. Okay. So that's kind of what makes up what they felt like. Not only did she not do it, but she didn't even document it. Thank you. Okay. So that goes through that one. Let's go to October. And by the way, when was the last comment in time? I mean, I know she did. I know about the pie chart. She puts everybody's race and she says, I want diversity. And she does a pie chart to see who's from where and all that. We, we understand those facts. But how, how much was that in time from these two incidents, the September, that was like in February or? The pie chart we placed in mid 2019, your honor.  Mid 2019.  When's the last comment before these 2020 incidents that you recited as you began your argument? The, the comments that I, that I stated were from mid 2019, your honor. There was an incident in which, any comments you can cite to in 2020, there was an incident in which in 2020, an African nurse was disciplined by miss Johnson for speaking in her native language, but there was nothing, your honor, there's not a comment by her. That's correct. All right. So the comment she started out, I'm just trying to understand the record because it's a big record. Our 2019 comments and these incidents are in September and October, 2020, is that correct? The, is that correct? And then you can go to whatever else. Yes. And no, your honor, explain the, the discipline as to miss Banks was in May. The termination of miss Sanusi was in October in 2020, miss Johnson continues to make comments, although not as overt about seeking to hire quote unquote diversity and that she wants to be sent candidates with, from different ethnic backgrounds. Okay. Well, can I, there is one statement that is in 2020, it doesn't, it may not be as overt as some of the others, but after the resignation of miss Banks, Johnson sends a text message to other colleagues and it says, well, Linda, it happened. You want to resign, say he resigned and Samantha abruptly resigned today. Nicole who's miss Lascota is taking care of business. So you've got that statement too. I don't know what it means in the overall picture, but you do have that statement after the fact, which I guess is, can be counted as circumstantial evidence of her discriminatory perspective. That's absolutely correct. And we also have, I have not had, I'm over my time. I see, but I have not had time yet to speak about the, you've been answering our questions. It's okay. Okay. You can have two minutes to wrap up. Thank you, your honor. Miss Banks opposed directly these discriminatory statements when the adverse action was being issued to her by Tabitha Johnson and miss Lascota. Tabitha Johnson directly brought up the discrimination complaint. That is not a factual issue. It's recorded. This is what she said. You know, when I went to HR, okay. And I'm going there. When you reported that I was discriminating and I was creating a hostile environment and when you reported me for those things, I had to bite my tongue and I had to allow them to do their investigation and I had to do my part and not come back to you because that's what was instructed of me. The final warning is issued. Miss Banks resigns. Miss Johnson celebrates. The sole basis for the adverse action as delivered to Miss Banks is a directive which presents a classic fact issue. All of the decision makers are in the same room as Miss Banks. They all say something diametrically different about what the directive was. If Miss Banks is, I thought, I thought the two on the Grady side of things were consistent in what the directive was. That's fair. You're on. I, I, I may have misspoke. Grady's account is diametrically.  That is, that is certainly true. Yes. Yes. And so if, if Miss Banks is version of events is assumed to be true, which it must be at summary judgment as the non-moving her testimony, which is direct, must be credited if she is telling the truth, then the decision makers had personal knowledge that the directive that she was issued for what she was being, being disciplined was not correct. Was there any, there's an illusion in the magistrate judge's report to there being some documentation sort of contemporaneous of that directive and what the directive was, is that was the magistrate, right? Was there separate documentation apart from the testimony of the individuals involved? There's allegedly contemporaneous documentation from, from this Laskota, which in our view, and as we pointed out in our brief was obviously revised after the fact, there's also contemporaneous documentation showing that. Why do you say revised after the fact? Because it says when describing the events of the day later that evening. Also, your honor, Miss Laskota testified that she did not find out about Miss Banks' alleged subordination until the next day. So it can't all have been written on the day that the instruction was given. Okay. We've, we've given you plenty of time and taking you over, but you've saved all of your time for rebuttal. Thank you, your honor. Thank you very much, Mr. Scott. Mr.  Good morning. May it please the court. The legal framework for evaluating discrimination and retaliation claims under title seven is well-established and undisputed here. It's also undisputed that Grady Memorial Hospital provided legitimate explanations for the employment actions at issue here. Accordingly, the key question here, as it is in many of the court's title seven cases is whether the plaintiff's evidence allows a reasonable fact finder to conclude that the employer's explanations are quote unworthy of credence, that's the critical question. And judge Ross, that's, that's, that's, if you proceed under the traditional McDonnell Douglas burden shifting framework, but if you proceed under the so-called mosaic theory, and I know that they're not, you know, perfect cabin, uh, different theoretical foundations for it, but if you proceed under the mosaic theory, isn't the question, whether a jury could find on this record, viewing the evidence in the light, most favorable to the particular plaintiff that he or she was either retaliated against or terminated or discriminated against because of national origin, I agree, your honor, that that is the question I would submit to your honor. And I think the court's opinion in time supports this, that when the employer has provided an explanation, the question, as you just articulated it is precisely synonymous with asking, could a jury conclude that the employer's explanation is pretextual because in order to conclude that the adverse employment action was the product of an impermissible motivation, which of course must always be shown, that's what the, because of language in title seven requires, whether we, regardless of the analytical framework we're using, when the employer has provided a legitimate explanation, whether it's the mosaic theory or McDonnell Douglas, ultimately the question for the jury is, is that explanation pretextual and a cover for a decision that was taken with an impermissible motivation? So regardless of the analytical framework, at the end of the day, that's the ultimate question. Well, let's focus on the mosaic theory. It's a little different because under the mosaic, that's just one of the many things you look at. Whereas in the McDonnell Douglas, that might be the only thing you look at. So I agree under the mosaic as part of everything, you can look at the reason and whether it seems pretext, but you also look at everything at the same time, you don't disagree with that. I don't disagree with that, Your Honor. No, no, it's really, it's not the sole thing you look at under the mosaic, but it can be considered in looking at the entirety of the record. Precisely, Your Honor. So I don't make it matters what theory we do. It's a matter of the whole thing, and part of the whole thing is the legitimate explanation and, and whatever evidence there is about whether that's just made up or not correct.  Yes, I agree, Your Honor. And obviously in these cases, the legal framework is now pretty settled. So can you help us with the record evidence? That's the problem. Yeah, thank you, Your Honor. Figuring out what the evidence is. Yes. Thank you, Your Honor. The one, the one additional note I would offer just for the sake of clarity is in my view, after reviewing the court's case law, I think the difference between mosaic and McDonnell Douglas really matters at the very beginning of the analytical step, because mosaic is a way for a plaintiff to proceed, even if the plaintiff can't establish a crime, precisely. Exactly. That doesn't, that's not an issue here. And so, precisely. Yes. Yes. Thank you, Your Honor. So to get, to get to the record, Judge Ross correctly concluded that both plaintiffs failed to clear the critical hurdle here. And I'll start with, with Ms. Banks. So Ms. Banks, Grady gave its explanation on the very day it issued her the final written warning, namely that Ms. Banks disobeyed an instruction to comply with Grady's common sense rule prohibiting contact and complainants during an HR investigation. And Grady provided at least five discrete categories of evidence that this was in fact Grady's reason for issuing the final written warning. Number one, Ms. Johnson, Ms. Banks' immediate supervisor, and Ms. LaScoda, the VP of Women's Health, Ms. Johnson's supervisor, provided this as the reason during the May 6th, 2020 meeting where they presented Ms. Banks with the final written warning. And the final written warning, a document, contains this reason itself. And that document is in the record. Right. But that, as to that point, for whatever it's worth, Ms. Johnson says, I mean, she says that the directive that was given to her was not to avoid contact with all three of the complainants, but only to avoid contact with one of them, right? So what do we do with that in the mix? Yes, Your Honor. And I promise I will address that if I could continue reciting. But she did contact that one, right? She undisputedly contacted that one. Okay. But she also contacted some others, accordingly. Yes. The question is whether she was told. I mean, it doesn't make much sense to me that you just say, don't do this one. You just say, don't talk to the complainants. But anyway, that's what she says. And I think, I do think that specifically looking at, it's really just a couple pages of Ms. Banks's deposition testimony provides a helpful amount of context that allows, I think, the court to sort of get a sense of what was going on. And the critical pages are 24 and 25 of her deposition testimony. It's docket 106-1 of the record. And it's, I think, very important to recognize Ms. Banks acknowledged at her deposition that during the earlier meeting, the April meeting, April 30 meeting, where they talked about these complaints, that they talked about Ms. Chi Chi Ndugwe. There's no dispute that they talked about her by name. And that's on page 24 of her deposition transcript. And then she is asked, OK, do you recall being instructed to keep your conversation private? And she says, I remember being asked not to speak to Daniela, one of the other complainants, about my IV skills. OK, you don't recall being instructed not to talk to others about their complaints about you? There were never any names provided to me about specific people and who said what, except for Daniela Lewis, which is directly contradicted by her testimony. One page earlier where she concedes that they talked about Chi Chi. And then she's asked again, you said there were never specifics of names provided to you about specific complaints. Yes, except my IV starting skills, Daniela Lewis. That's yes. So you remember being told not to talk to Daniela, but you don't remember being told not to talk to anyone about the allegations. Correct. So that's that's Ms. Banks's testimony. So her just to clarify, her testimony is not. I remember distinctly you can talk to Daniela, but you're allowed to talk to everyone else. That's that's not the testimony. The testimony is, well, I remember being told that I shouldn't talk to Daniela and maybe perhaps generously construed. She is testifying. I wasn't told specifically. No other specific names were provided in terms of the direction. I think that's the most generous interpretation of her deposition testimony. And the critical question here, and Judge Ross pointed this out, is not. What precisely was the instruction given? The question is, did Ms. Laskota, the gritty decision maker here, genuinely believe that Ms. Banks violated a direction? And it's important, Ms. Banks's testimony is not inconsistent with that belief. Maybe there was a miscommunication at the April 30 meeting. That's entirely conceivable. And you can't but you can't. It's this is a hard case in this respect, at least for me. You can't separate what the directive was from whether or not there was a reasonable belief that the directive had been violated. In other words, assume a different record. OK, very different record. If Ms. Laskota had said. I told her not to speak to nurse one. But I told her she could speak to nurses two and three. Later. She gets discipline for speaking to two and three, and Ms. Laskota says, oh, she violated my directive. That's not a reasonable belief that she violated the directive, right? Because Ms. Laskota admitted that the directive allowed contact with nurse one. I think that's right, your honor. And if if there were additional evidence in the record, I think this is important that Ms. Laskota had reasons to lie about that and was lying for a discriminatory purpose. Like all of that is all of this evidence is relevant. And I think that's why Judge Ross appropriately considered all of the evidence. So we have on Ms. Banks aside, the one piece of evidence Ms. Banks has is the deposition testimony that I just recounted about precisely what she remembers, the nature of the conversation. And then on the other side, we have the Ms. Johnson's testimony, Ms. Laskota's testimony, both about what was said and about their own beliefs at the May 6 meeting, what they said during the May 6 meeting, which I think is very important that this was at the time of the decision. This was the asserted reason that we have contemporaneous notes that Ms. Laskota took on April 30th. Also critical that Ms. Laskota wrote at the time. Yeah, I gave her this instruction and she disobeyed the instruction immediately. She said that. And then fourth, also very important, Grady's explanation here is consistent with its other actions, including requiring that Ms. Johnson not contact complainants during Grady's investigation of her. And I think that's a very important point. I think the intuition that you are getting at, Your Honor, Judge Gordon, is if a supervisor issues an instruction that seems arbitrary, that there's no reason why in the world would a supervisor say you're allowed to contact this person and you're not allowed to contact that person and draw that draw that arbitrary distinction. And then but they say, that's what I told them. That's what I told them. That that raises, OK, well, maybe that doesn't really make much sense. That's not consistent with the policy. But the test and there's certainly no reason to think that you genuinely thought that you told them that. But here the testimony is we talked about some complainants and we thought we told her, don't talk to any of them because that's our policy. You're not supposed to talk to complainants. And why would we divvy things up? And again, there's no dispute. They talked about Gigi during the meeting. Ms. Banks admits that, which I think is very important. And I also think it's important as well that Grady did not jump straight to termination. That this was the violation here resulted in a final written warning. And again, that undermines any suggestion this was part of a retaliatory plot. And especially important, too, that Ms. LaScoda was involved in this process. She made the ultimate decision. We don't dispute that Ms. Johnson was involved in the decision making process, that she was involved in this process. She was at the meeting. That's certainly true. No dispute about that. But Ms. LaScoda made the decision. And Ms. LaScoda has no reason to retaliate against Ms. Banks. No reason at all. And so for all of those reasons, we think it was appropriate for Judge Ross to conclude in light of all of this evidence, there is no grounds for a reasonable fact finder to conclude Ms. LaScoda is completely lying. All of this is untrue. This was all a scheme to retaliate against Ms. Banks. Ms. Banks' theory is implausible. And I think it's important to note, to address your concern, Judge Jordan, this court has repeatedly granted or affirmed either affirming the grant or directing the grant of summary judgment in similar situations, including where the plaintiff denied the employer's recitation of events. This court did that in Gogol versus Kia Motors. There, the plaintiff denied eliciting the co-workers EEOC complaints. And this court, nevertheless, affirmed the grant of summary judgment. And for those convincing mosaic cases. Well, Ms. Banks is not raising a convincing mosaic theory, Your Honor. So but I thought she had raised both below. Ms. Sanusi raised both below, Your Honor. I thought it was the other way around. I thought it was Ms. Sanusi with only the mosaic and Ms. But I could be confused. Yeah, I believe that Ms. Sanusi raised both below and Ms. Banks did not raise both below. That's my right. Can you give him another minute, please? Can you talk about Ms. Sanusi's case before you go? Yes, Your Honor. Thank you. And so as for Ms. The simplest way to approach Ms. Sanusi is the preceptor, the September 2020 incident. There's no dispute that she was the preceptor supervising a nurse who failed to take blood pressure for an entire 12 hour shift. That's a, Grady has always identified that as an explanation for its decision. That's obviously a legitimate reason. And Ms. Sanusi's response is simply, well, she was an experienced nurse. And so it's not fair to hold me responsible for her failure, but that's simply quibbling with Grady's policy. And this court has held time and again that employee quibbles with employer decisions and how they apply their policy does not a Title VII violation make. So that's the simplest. I think that's, there's really, the record's crystal clear on that. We could talk about the deceit here, the deceit that Judge Hull and my colleague on the other side were talking about in connection with the failure to take blood pressure. The only point I would add on that is in Ms. Sanusi's response to Grady's statement of material facts, the, and let me find that for the court, yeah, that is, ECF 10614, the, or that's the, that's the Bennett deposition, excuse me. But the, the response to our statement of material facts, Ms. Sanusi disputed the assertion that she didn't take the blood pressure, but she did not dispute the other part of the allegation in the statement of material facts that she said that the blood pressures were taken. And that's important. And there is this, this, how do we go to that? Is that from the assessment? She said the blood, do we have the assessment? We do not have the assessment in the record, Your Honor. So we have her, who says she said the blood pressures were taken? The, she says that? No, no, no one says the blood pressure. So where is the evidence of that? Yes. So the critical piece of evidence is from the Bennett deposition. And that is ECF 10614, and it's a page 194 of the transcript. And the, that deposition discussion includes the Ms. Bennett referring to the shift assessments. And I think there's, there's a question about whether or not you can draw an inference about what the shift assessment said from her testimony. I think it's, I think it is fair to infer that she's saying, yes, the shift assessment said that the, that there was blood pressure taken, even though. Let's go back to your first point, whatever about whether she misrepresented or not about in the shift assessment. So let's put that aside. As you, you say, all right, your theory is that for 12, they don't dispute that no blood pressure was taken for 12 hours. Okay. And so you're saying the nurse didn't do it and you're saying she's the preceptor, the supervisor, the nurse, and that's that her response to all that is, well, that's not my job to, to supervise the nurse and make sure. I mean, I think that's what I heard. I think so, your honor. Although I would characterize their Ms. argument on this point about the wisdom of the policy, not the content of the policy. And so where's the policy that comes from a Ms. Johnson's testimony, your honor. Um, and that is, uh, pages 258 to 260 of her deposition. That's a docket one of six desk dash five. And that nurse that day was in orientation all day or part of the day. Or do we know? Uh, I, I'm not, my understanding is that orientation lasts more than one day. You're right. It's a period of time. I could be mistaken about that. Yes. And, and, and of course, then the other issue with Ms. Zanussi is the October 2nd, 2020 blood pressure, uh, not, not reporting the elevated blood pressure. And here again, I should note that there's no dispute about what Ms. Johnson knew with respect to the clocks. Grady agrees that Ms. Initial misbelief was mistaken. Um, and in fact, I think that shows that Ms. Johnson is doing her job and is actually doing an investigation and recognizes. Yeah, the clocks were mistaken, but Ms. Johnson nevertheless concluded. You didn't immediately go to the physician and there's no dispute about that. Uh, Ms. Banks acknowledges that she waited five minutes. She went to treat another patient and Grady says that kind of delay is not acceptable. These are new mothers. When a new mother has elevated blood pressure, that can be a life or death situation. And again, this court has said repeatedly an employer, an employee's objection to the way an employer, uh, interprets its policy or applies its policy does not constitute evidence of an impermissible motive. And that's really the critical thing. There is no evidence that would allow.  Hudson. We've taken you way over your time. I apologize, your honor. Yes. Thank you. I understand. We understand your arguments. Thank you very much. Thank you. Mr. Scott. Thank you. Honors it a number of items to address. I was going to do it without your time. Can you help us out? What was raised in the district court? Uh, is banks raised, um, commencing mosaic in the district court or only met Donald Douglas? Thanks. Raised both expressly. Okay. And then on appeal, she raises both, both, although through the vehicle of your honor, which contemplates the, the straight application of rule 56.  And then the other plaintiff, she raised both below. No, your honor. Okay. Yes. The new C raised convincing mosaic below only. Okay. Thank you. In part, because we can see that there is no comparator to this unique situation. And so who is the comparator on banks? That there is no comparator for Ms. Banks. She, she asserted a retaliation claim. A comparator is not required. She only does retaliation, not discharge.  Not right.   So you don't need a comparative there.  Got it. Correct. Uh, Ms. Banks did not contact Daniela Lewis. That is who she was told not to contact. I want to make sure that that's clear on the record. Did she, she did contact her? She did not. Okay. Affirmatively did not. She also, if we're looking at contemporaneous notes, the contemporaneous notes that exist from Ms. Lascota say expressly that Ms. Banks denied at the time that the adverse action was issued. That she denied contacting Daniela Lewis. That's docket one Oh six 11 page two 98. My colleagues said judge Ross considered all the evidence. Who did she contact? She contacted two additional nurses who she was not instructed not to contact. Had they complained? I believe that they had your honor. They had not. I believe that they had. They had complained. My understanding is that the record supports that they had complained. Yes. They complained about, did we know what they had complained about? There were, I believe two separate incidents, one having to do with the admittance of a baby, the other having to do with Ms. Banks's reaction to asking for help. I believe, but your honor, that the, the sole basis for the adverse action is the alleged insubordination. I understand. Not the underlying complaints. And when it was one of the nurses, she contacted Chi Chi.  And she, she, her testimony, she contacted her to try to get constructive feedback. And you know, what's going on, how can I do better not to try to violate any directive? And the, the directive that was issued, she followed. And if you assume she is telling the truth, which must happen here, then she did not violate a directive. And the people who were issuing her the adverse action knew it based on their own personal knowledge. Well, how do they know it when they say that they told her not to contact any of the complainants? What? Well, I mean, that's their testimony. That's their testimony. But I don't know. They knew it. But that testimony contradicts Ms. Banks's testimony as to the statements that happened in that meeting, which your argument is that her, your client's testimony has to be taken as true at summary judgment, and that means, although it's not determinative, that means that the directive she was given was only a directive to not contact one of the nurses. That is correct. And she complied with that directive based on her version of what happened at the initial meeting. That is correct. She contacted the other two, which she wasn't prohibited from doing, and she didn't contact the one she was told to stay away from. Correct. And when there are disputes like this, this court has routinely found a jury issue and reverse summary judgment, including in the Batson versus Salvation Army case, in the Vessels case, when there are competing narratives based on personal knowledge about what happened in the meeting, it's the non-movens version that must be credited and believed. And the retaliation is because of her, not national origin from Banks, but race? The retaliation is for her opposition to the discrimination on the basis of national origin, which she complained about expressly to HR, which Tabitha Johnson knew about, and one thing, Your Honors, I want to make very clear. The district court did not consider the statement that I read that Tabitha Johnson said to Ms. The district court said it was unclear whether Johnson knew about the protected activity when issuing the adverse action. It's not unclear. There's a recording of her referencing it. But the magistrate judge did consider that. The magistrate lays that out in the report and recommendation, right? Absolutely, Your Honor. The report and recommendation that the district court was adopting found that Johnson knew about it. The district court decision said it was unclear whether Johnson knew about it. That is a critical piece of evidence when you're considering the totality of the evidence showing retaliatory animus here that was missed. There is no evidence anywhere that Ms. Sanussi lied about taking blood pressures on September 17, 2020. None. Nobody has testified to that. We absolutely denied, it says denied or disputed rather, statement of material fact number 63. The statement of material fact number 88, which was Grady's statement of material fact recognizes the direct contradiction between the two directives from Ms. Banks. I see that I'm over, Your Honor. You're over. You have a minute to wrap up. Okay. This is an important case with substantial evidence. We have a mountain of discriminatory animus by the decision maker. We have a reference to the protected activity when issuing the adverse action to Ms. Banks. There are jury questions here. We ask that we would be permitted to submit this evidence to a jury. We thank the court for its valuable time. All right. Thank you both very much.